IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Z-AXIS TECH SOLUTIONS, INC. and SRINIVAS NOMULA,<br><br>                    Plaintiffs,<br><br>          v.<br><br>RICHMOND CAPITAL GROUP, LLC and CAP CALL, LLC,<br><br>                    Defendants. | Civil Action: 17-cv-03983 (GBD) |

**BRIEF OF PLAINTIFFS Z-AXIS TECH SOLUTIONS, INC. AND SRINIVAS NOMULA IN OPPOSITION TO DEFENDANT CAP CALL, LLC'S MOTION FOR SUMMARY JUDGMENT**

**ARCHER & GREINER, P.C.**
Attorneys for Plaintiffs
Patrick Papalia, Esq.
Josiah Contarino, Esq.
44 Wall Street, Suite 1285
New York, NY 10005
201-342-6000
ppapalia@archerlaw.com
jcontarino@archerlaw.com

August 22, 2017

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................................................. ii

INTRODUCTION ................................................................................................................ 1

STATEMENT OF FACTS .................................................................................................... 2

LEGAL ARGUMENT ........................................................................................................ 12

     I.     Cap Call's motion for summary judgment is premature. ................................... 12

     II.    Cap Call's summary judgment motion must be denied because there exists
            genuine issues of material fact ......................................................................... 15

CONCLUSION .................................................................................................................. 26

213076313v1

# TABLE OF AUTHORITIES

Page(s)

**Federal Cases**

*1443 Chapin St., LP v. PNC Bank, Nat'l Ass'n*,
  258 F.R.D. 186 (D.D.C. 2009) ................................................................................12

*Allen v. Westpoint-Pepperell, Inc.*,
  11 F. Supp. 2d 277 (S.D.N.Y 1997) .......................................................................16

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ..................................................................................12, 15, 16

*Bristol Vill., Inc. v. La.-Pac. Corp.*,
  916 F. Supp. 2d 357 (W.D.N.Y. 2012) ....................................................................17

*C.f. Trimper v. Terminix Int'l Co.*,
  82 F. Supp. 2d 1 (N.D.N.Y. 2000) .........................................................................23

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ..............................................................................................12

*Cohen v. JP Morgan Chase & Co.*,
  498 F.3d 111 (2d Cir. 2007) ...........................................................................16, 17

*Consarc Corp. v. Marine Midland Bank*,
  N.A., 996 F.2d 568, 572 (2d Cir. 1993) ...........................................................15, 16

*Dessert Beauty, Inc. v. Platinum Funding Corp.*,
  519 F. Supp. 2d 410 (S.D.N.Y. 2007) .....................................................................23

*Endico Potatoes v. CIT Group/Factoring*,
  67 F.3d 1063 (2d Cir. 1995) ..................................................................................21

*Home Bond Co. v. McChesney*,
  239 U.S. 568 (1916) ..............................................................................................23

*MedImmune, Inc. v. Genentech, Inc.*,
  549 U.S. 118 (2007) ..............................................................................................19

*Milligan v. Clinton*,
  266 F.R.D. 17 (D.D.C. 2010) .................................................................................13

*Myers Indus. v. Schoeller Arca Sys.*,
  Inc., 171 F. Supp. 3d 107, 122 (S.D.N.Y. 2016) ................................................18, 19

213076313v1

*In re O.P.M. Leasing Servs., Inc.,*
   30 B.R. 642 (Bankr. S.D.N.Y. 1983) ...................................................................22

*Park Ave. Bank, N.A. v. Bankasi,*
   No. 93 CIV. 1483, 1995 U.S. Dist. LEXIS 18433 (S.D.N.Y. Dec. 13, 1995),
   *aff'd*, 101 F.3d 1393 (2d Cir. 1996) ...................................................................13

*Patton v. Gen. Signal Corp.,*
   984 F. Supp. 666 (W.D.N.Y. 1997) ...................................................................13

*Pereira v. Aetna Cas. & Sur Co.,*
   186 F.3d 196 (2d Cir. 1999) ...................................................................18

*Quantum Corp. Funding, Ltd. v. Assist You Home Health Care Servs. of Va.,*
   *L.L.C.,*
   144 F. Supp. 2d 241 (S.D.N.Y. 2001) ...................................................................23

*Richmond Lace Works, Inc. v. Epstein,*
   31 F.R.D. 150 (S.D.N.Y. 1962) ...................................................................18

*Sacks v. Gandhi Eng'g, Inc.,*
   999 F. Supp. 2d 629 (S.D.N.Y. 2013) ...................................................................13

*Statler v. Dell, Inc.,*
   775 F. Supp. 2d 474 (E.D.N.Y. 2011) ...................................................................16

*In re Venture Mortg. Fund, L.P.,*
   245 B.R. 460 (Bankr. S.D.N.Y. 2000) ...................................................................20

*Wall v. CSX Transp., Inc.,*
   471 F.3d 410 (2d Cir. 2006) ...................................................................16

*Wichita Falls Office Assocs. v. Banc One Corp.,*
   978 F.2d 915 (5th Cir. 1992) ...................................................................13

**State Cases**

*Abir v. Malky, Inc.,*
   873 N.Y.S.2d 350 (App. Div. 2009) ...................................................................23

*Blue Wolf Capital Fund II, L.P. v. Am. Stevedoring Inc.,*
   961 N.Y.S.2d 86 (App. Div. 2013) ...................................................................25

*Clever Ideas, Inc. v. 999 Rest. Corp.,*
   2007 NY Slip Op 33496(U), 2007 N.Y. Misc. LEXIS 9248 (N.Y. Cnty. Sup.
   Ct, Oct. 26, 2007) ...................................................................25

213076313v1

*Fred Schutzman Co. v. Park Slope Advanced Med., PLLC,*
    9 N.Y.S.3d 682 (App. Div. 2015) ........................................................................25

*Hammelburger v. Foursome Inn Corp.,*
    437 N.Y.S.2d 356 (App. Div. 1980) ....................................................................25

*Merchand Funding Services, LLC v. Volunteer Pharmacy Inc.,*
    44 N.Y.S.3d 876 (N.Y. Sup. Ct. 2016)........................................................ 19, 20

*N. State Autobahn, Inc. v. Progressive Ins. Grp. Co.,*
    953 N.Y.S.2d 96 (App. Div. 2012) ......................................................................17

*New York State Electric & Gas Corp. v. Aasen,*
    550 N.Y.S.2d 223 (App. Div. 1990) ....................................................................24

**State Statutes**

N.Y. Gen. Bus. Law § 349 ....................................................................... 16, 17

**Rules**

Fed R. Civ. P. 56.................................................................................... 13, 15

Fed. R. Civ. P. 56(c).....................................................................................15

Fed. R. Civ. P. 56(d).....................................................................................13

Fed. R. Civ. P. 56(f).............................................................................. 12, 13

Local Civ. R. 56.1.........................................................................................12

Fed R. Civ. P. 12(b)............................................................................... 10, 14

**Other Authorities**

*Black's Law Dictionary* 612 (7th ed. 1999) ............................................23

213076313v1

## INTRODUCTION

Cap Call, LLC's ("Cap Call") motion for summary judgment fails both because material facts remain genuinely disputed, and because information to contest facts deemed "undisputed" by Cap Call is required as no discovery has been taken at this early juncture in this litigation. For example, Cap Call claims that its funding to Z-Axis was not a loan. In its next breath, however, Cap Call admits that New York courts have indeed found merchant agreements to be loans despite their "merchant agreement" label. Of course, if Cap Call's funding is deemed a loan, then the agreement in dispute is void, which is what Z-Axis's complaint asks this Court to find.

Further, despite Cap Call's conclusory assertion that "Cap Call plays no part in the discussion" of Richmond Capital Group, LLC's ("Richmond Capital") unreasonable broker's fee (here, a $40,000 broker's fee on what was supposed to be $400,000 in funds), Cap Call advertises that one of its "priorit[ies]" is to ensure broker's (such as Richmond Capital) "make the maximum amount of commission." Indeed, Cap Call confirms that it works for the broker, and that the broker "represent[s] [Cap Call] directly." Cap Call's part is Richmond Capital's misrepresentations to Z-Axis are not fully known; indeed, how could they be when precisely zero discovery has been exchanged?

This is yet another reason why Cap Call's summary judgment motion must be denied. Cap Call filed its summary judgment motion despite that (i) no party had propounded even its first set of written discovery requests; (ii) no depositions have been scheduled, let alone taken; and (iii) the Court has not even entered a scheduling order providing applicable dates and deadlines for discovery, dispositive motions, and other routine case management issues.

As more fully explained below, this matter is not ripe for summary judgment at this stage. Material facts remain genuinely dispute, and the discovery process has yet to begun. Cap Call's motion for a decision on the merits of this matter is premature and must be denied.

1

## STATEMENT OF FACTS

**The Funding.**

At 2:18 p.m. on March 27, 2017, Richmond Capital representative Mimi Parker emailed Z-Axis to introduce herself. In that email, Ms. Parker advised Z-Axis that Richmond Capital "ha[d] [Z-Axis] approved for 300k." (Affidavit of Srinivas Nomula in Opp. to Mot. for Summary Judgment (Aug. 22, 2017) ("Nomula Aff."), ¶ 3, Ex. A).

At 2:34 p.m. on March 27, Ms. Parker again emailed Z-Axis with these funding terms:

> We have 300k payback 420k daily $3,500 a day.
>
> With an early discount option that will be part of the addendum – which simply means if you choose to pay the money early we will give you a 10% discount.

(*Id.* ¶ 4, Ex. B).

At 3:22 p.m. on March 27, Ms. Parker emailed a "1st AGREEMENT," which included three PDF documents: the first of which had a purported Merchant Agreement, a Security Agreement, a Guaranty, an Authorization for Servicing Agent, and ACH Authorization for Daily Withdrawals, all related to Cap Call; the second of which was a Confession of Judgment; the third of which was a single Richmond Capital ACH Authorization Form. (*Id.* ¶ 5, Ex. C).

At 4:07 p.m. on March 27, Ms. Parker emailed a "2nd AGREEMENT," which included one PDF document that included the following: a purported Secured Merchant Agreement, a Security Agreement, a Guaranty, an Addendum to the Agreement regarding ACH payments, a Capital Advance ACH Authorization Form, and a Confession of Judgment. (*Id.* ¶ 6, Ex. D).

The entire transaction took only approximately 4 hours from start to finish, as Richmond Capital was pressuring Z-Axis to quickly complete the deal. Although Z-Axis was to receive $400,000, $60,000 was wrongly and deceptively misappropriated by Defendants. When Z-Axis

2

realized it had been deprived of $60,000, Z-Axis made immediate and regular contact with Richmond Capital for the return of the $60,000 to Z-Axis. (*Id.* ¶ 7).

Richmond Capital initially represented not only that it would be providing the funding itself, but also that there would be only a single transaction. Indeed, Plaintiffs believed Richmond Capital to have been the funder as Richmond Capital reached out to Plaintiffs regarding funding, was corresponding to and speaking with Plaintiffs during the transactions, and was sending documents and information to Plaintiffs for the transaction. (*See id.* ¶ 8, Exs. A-D).

Nevertheless, Cap Call and Capital Advance were lurking in the background. It obviously benefitted Richmond Capital to *not fund* the transaction, despite its representations that it would be, and to instead have the transaction funded by multiple separate funders, such as Cap Call and Capital Advance. *Not funding* the transaction allowed Richmond Capital to slip in with the loan agreements $40,000 of theretofore undisclosed "broker's fees." Obtaining two separate lenders to lend the monies, instead of one, allowed Richmond Capital to include *multiple* broker's fees, however unjustly. (*Id.* ¶ 9).

And this benefit to Richmond Capital is precisely what Cap Call seeks to ensure. Cap Call advertises that one of its "priorit[ies]" is to ensure brokers (such as Richmond Capital) "make the maximum amount of commission." Indeed, Cap Call confirms that it works for the broker, and that the broker "represent[s] [Cap Call] directly." (*Id.* ¶ 10, Ex. E).

**The Cap Call Agreement.**

After Plaintiffs' complaint was filed with this Court, Cap Call went and filed a confession of judgment in the Ontario County Supreme Court of New York (Affidavit of Douglas E. Robinson, Esq. (July2 6, 2017) ("Robinson Aff."), Ex. D) upon an agreement that was couched as a merchant agreement (sometimes referred to as "Cap Call agreement" or "agreement") but is

3

really a loan (Robinson Aff., Ex A). As is demonstrated and quoted below, the Cap Call agreement was really just a loan in disguise; the loan was criminally usurious at an annual interest rate upwards of 80%; and the agreement eliminated all risk and hazard of nonpayment to Cap Call. (*Id.* ¶ 11).

Contrary to Cap Call's representation that the agreement was a "no recourse" agreement from which Cap Call would collect receivables from Z-Axis only if receivables were received by Z-Axis, (Affidavit of Evan Marmott (July 26, 2017) ("Marmott Aff."), ¶ 13), the actual terms of the Cap Call Agreement and the transaction at hand show that (1) Cap Call neither requested nor received the identity of any Z-Axis receivable, customer, or invoice; (2) the Cap Call agreement had no mechanism or intent for the delivery to Cap Call of any Z-Axis receivable or invoice, or the identity of any Z-Axis customer; (3) the Cap Call agreement intended for Z-Axis customers to pay Z-Axis as they did before the Cap Call agreement; (4) if a customer did not pay Z-Axis, it was solely Z-Axis's loss, not Cap Call's; (5) Cap Call took zero risk that a customer of Z-Axis might not pay; (6) the only obligation of Z-Axis under the agreement was to pay daily the Specific Daily Amount of $1,999; and (7) Plaintiff Srinivas Nomula had to personally guaranty Z-Axis's payment to Cap Call. (*Id.* ¶ 12).

Review of the agreement here shows that it feigned to be the purchase of receivables but was really just a loan. Indeed, whereas the house and closing date are identified in a purchase contract to buy a home, or the car and purchase date in a contract to buy a car, here, neither the Cap Call agreement nor any other document ever provided for the delivery or even the identify of any Z-Axis receivable, invoice or customer. It was therefore impossible for Cap Call to actually acquire or purchase any receivable of Z-Axis. (*Id.* ¶ 13).

213076313v1

Under the Cap Call agreement, the only thing contemplated to be identified or delivered was the Cap Call initial payment of $200,000 to Z-Axis, and Z-Axis's payment to Cap Call of $279,800. (*Id.* ¶ 14).

The interest charged by Cap Call on the Cap Call agreement was well over 25% per annum at an incredible 80%. Under the agreement, the total paid to Z-Axis was $200,000 (less Cap Call's fee), for which Z-Axis had to pay Cap Call back $279,800, by a daily payment of $1,999 per day. Under that payment schedule, the $279,800 would be paid off in 180 days (140 business days, as the agreement called for payment on business days only): $1,999 multiplied by 140 equals $279,860, thus Z-Axis had to pay $279,860 to Cap Call within 180 days. (*Id.* ¶ 15).

The $79,800 was the interest that Z-Axis had to pay on the $200,000 it received from Cap Call. $79,800 interest on $200,000, if it had to be paid back over a year, would have been 39.9% interest. The agreement required payments of $1,999 per day, which meant approximately 140 payments of $1,999 each – or 180 days (140 business days) to pay the $279,800. 180 days is 49% of a year. Since 39.9% interest had to be paid back in 49% of a year, that was an annual interest rate of just over 80%: $79,800 divided by $200,000 equals 39.9%, which divided by .49 of a year, equals 81% interest. (*Id.* ¶ 16).

With an annual interest rate above 25%, Cap Call could not designate its agreement a loan, so it had to label it something else. The only thing that Cap Call has to show that the agreement was a purchase of receivables was the mere say-so in its agreement. The only thing Cap Call wanted to get under the terms of the agreement was payment of $279,800 at $1,999 per day. Where A pays B a sum of money and B has to pay A back more, that is a loan. Nevertheless, the Cap Call agreement categorized Cap Call as the "purchaser" even though the agreement was designed for Cap Call to be the one getting paid. (*Id.* ¶ 17).

5

The $1,999 per day that Z-Axis had to pay Cap Call was seemingly arbitrary, purportedly "an estimate" of 10% of Z-Axis's daily receivables. (Marmon Aff., ¶ 14). Yet, in the other transaction that occurred near-simultaneously with Cap Call's, and also brokered by Richmond Capital, $1,999 was calculated as 15% of Z-Axis's daily receivables. The 10% made little difference anyway as it was replaced by the Specific Daily Amount of $1,999, an "estimate" that was meaningless because Cap Call never asked for any information about Z-Axis's expenses, such as the salaries of its employees or otherwise. Apparently, the real intent behind the Specific Daily Amount of 10% was to fool Plaintiffs into believing that this was the actual interest rate. (*Id.* ¶ 18).

The agreement between the parties eliminated all risk or hazard that Cap Call would not be paid. The agreement's first page stated that $200,000 would be paid to Z-Axis from Cap Call ("Purchase Price"), and that $279,800 ("Receipts Purchased Amount") would be paid to Cap Call by Z-Axis at $1,999 per business day. The first page provided that Cap Call would ACH-debit the Specific Daily Amount each business day:

> The Purchased Amount shall be paid to CCL by Merchant's irrevocably authorizing only one depositing account . . . to remit . . . until such time as CCL receives payment in full of the Purchased Amount. Merchant hereby authorizes CCL to ACH Debit the specified remittances from the Merchant's bank account on a daily basis . . . . Merchant understands that it is responsible for ensuring that the Specified percentage to be debited by CCL remains in the account . . . .

(*Id.* ¶ 19).

The Merchant's "ensuring" that the daily debit is in the account demonstrates that the Specific Daily Amount was not dependent on any sales or revenue. Z-Axis did not have a choice to pay the Specific Daily Amount by check or other means. It was automatically debited by ACH debit, each business day, by Cap Call. (*Id.* ¶ 20).

6

Despite Cap Call's representations to support its motion that Z-Axis's repayment of the $200,000 was "conditional," the Cap Call agreement includes a fail-safe provision under which Z-Axis would be in default if its financial condition developed any material adverse change:

> Merchant represents, warrants and covenants that as of this date and during the term of this Agreement: **2.1 Financial Condition and Financial Information.** Its bank and financial statements . . . and future statements which will be furnished hereafter at the discretion of CCL, fairly represent the financial condition of Merchant at such dates, and since those dates there has been no material adverse changes, financial or otherwise, in such condition, operation or ownership of Merchant. Merchant has a continuing, affirmative obligation to advise CCL of any material adverse change in its financial condition, operation or ownership.

(*Id.* ¶ 21).

Section 3.1 states that if the "Merchant shall violate any term or covenant in this Agreement" it was an "Event of Default." The Agreement also provides that, in an "Event of Default," the "Specified Percentage" shall go from 10% to 100%. The warranty and covenant in Section 2.1 eliminated all risk or hazard of nonpayment because it contained a MAC (material adverse change) clause that extended throughout "the term of this Agreement." The MAC clause put Z-Axis in default if it had any material adverse change in its financial condition until Cap Call was paid in full. Diminished cash flow threatening the daily payment was a material adverse change. The MAC clause was intended strictly to put the Merchant with diminishing cash flow into default, and no other purpose, as evidenced by section 1.3. The MAC clause was not to protect Cap Call from having to fund Z-Axis because section 1.3 provided that Cap Call "reserves the right to rescind the offer to make any purchase payments hereunder, in its sole discretion." (*Id.* ¶ 22).

Section 1.5 of the Cap Call agreement stated that the "Merchant authorizes their bank to provide CCL with Merchant's banking and/or credit-card processing history to determine

qualification or continuation in this program."[1] Conditioning Z-Axis's "continuation in this program" on a Cap Call's investigation in Z-Axis's financial outlook enabled Cap Call to use section 2.1 to put Z-Axis in default, thus eliminating Cap Call's risk of non-payment under the agreement. (*Id.* ¶ 23).

Page 1, penultimate paragraph, states that the "Merchant . . . authorizes CCL . . . to (i) investigate any references . . . or data obtained from or about Merchant . . . and (ii) pull credit report at any time . . . for CCL'S ability to determine Merchant's eligibility to enter into any future agreement with Company." Section 1.5's purpose was therefore not to determine Z-Axis's eligibility to enter into any future agreement with Cap Call (that is governed by the penultimate paragraph on page 1 of the agreement), but instead Z-Axis's eligibility to continue with the present loan. (*Id.* ¶ 24).

The agreement also had a purported reconciliation provision for adjusting the Specific Daily Amount:

> [U]pon Merchant's request, and receipt of the Merchant's monthly bank statements, CCL shall, on or about the fifteenth day of each month, reconcile the Merchant's account by either crediting or debiting the difference between the amount debited and the Specified Percentage, from or back to the Merchant's bank account so that the amount debited each month equals the Specified Percentage. CCL may, upon Merchant's request, adjust the amount of any payment due under this Agreement at CCL's sole discretion and as it deems appropriate. Notwithstanding anything to the contrary in this Agreement or any other agreement between CCL and Merchant, upon . . . the occurrence of an Event of Default under Section 3 of the MERCHANT AGREEMENT TERMS AND CONDITIONS, the Specified Percentage shall equal 100%.

(*Id.* ¶ 25).

This reconciliation provision was illusory because it was negated by the second sentence, which provides that Z-Axis had no right whatsoever to an adjustment of the $1,999 daily

---

[1] The Cap Call agreement abbreviates Cap Call to "CCL." (*Id.* ¶ 23 n.1).

payment unless Cap Call voluntarily made it: "CCL may, upon Merchant's request, adjust the amount of any payment due under this Agreement at CCL's sole discretion and as it deems appropriate." (*Id.* ¶ 26).

The voluntary nature of the adjustment is further evidenced by use of the permissive "Cap Call may." Also, adjusting the Specific Daily Amount to what Cap Call deemed "appropriate," in its "sole discretion," was not an enforceable standard. (*Id.* ¶ 27).

Of course, as soon as Z-Axis requested any reduction in the fixed daily payment, it would violate the agreement's MAC clause, constituting an Event of Default. (*Id.* ¶ 28).

That the agreement removed all risk and hazard of nonpayment to Cap Call is further shown by its provisions concerning bankruptcy. Section 2.9 states that in "the event the Merchant files for bankruptcy . . . Protections 2 and 3 are immediately invoked." Section 1.11 explains the "protections": "**Protection 1.** The full uncollected Purchase Amount plus all fees due under this Agreement and the attached Security Agreement become due and payable in full immediately. **Protection 2.** CCL may enforce the provisions of the Personal Guarantee of Performance against the Guarantor." (*Id.* ¶ 29).

Thus, if receivables are not being paid to Z-Axis and it must file for bankruptcy, then Cap Call can collect on the Personal Guarantee against Plaintiff Srinivas Nomula. Bankruptcy is also an "Event of Default." Agreement § 3.1(c). The agreement therefore directly contradicts Cap Call's representation that it "has *no recourse* against a business or its principal if the business fails and the merchant ceases having receivables." (*Id.* ¶ 30 (quoting Marmott Aff. ¶ 13)).

Section 2.4 requires business-interruption insurance: "Merchant will maintain business-interruption insurance naming CCL as loss payee and additional insured in amounts and against

risks as are satisfactory to CCL and shall provide CCL proof of such insurance upon request." (*Id.* ¶ 31).

Through multiple ways the agreement was carefully crafted to remove from Cap Call all risk and hazard of nonpayment. Review of the agreement in its entirety dismantles any claim to the contrary. (*Id.* ¶ 32).

Indeed, Cap Call's actions corroborate such a reading. Cap Call offers no evidence that it attempted to determine the cause for any non-payment of receivables before filing its confession of judgment after "numerous NSF's [sic]" were returned. (*Id.* ¶ 33 (quoting Marmott Aff. ¶ 18)). Further, the judgment included attorney fees of $44,962.50 even though everything Cap Call submitted was boilerplate (and yet it still incorrectly drafted the affidavit[2] in support thereof). (*Id.* ¶ 33).

The agreement was a loan. The $79,800 on top of the $200,000 that Z-Axis had to repay within 140 business days was criminally usurious interest at 80%. The Cap Call agreement is null and void. (*Id.* ¶ 34).

**This Litigation.**

On May 25, 2017, Plaintiffs' complaint was filed with this Court. (*Id.*, Ex. F). On or about June 21, 2017, Defendant Richmond Capital Group, LLC filed a motion to dismiss under Rule 12(b). On or about June 30, 2017, Cap Call filed an answer and counterclaim. On May 25, 2017, Plaintiffs' complaint was filed with this Court. (*Id.*, Ex. G).

Plaintiffs opposed Richmond Capital's motion to dismiss on July 19, 2017. Plaintiffs also cross-moved for leave to file a first amended complaint. Plaintiffs answered Cap Call's

---

[2] The affidavit Cap Call filed with the Ontario County Clerk is wholly inaccurate, apparently reciting figures from an agreement entirely different from the one between Cap Call and Z-Axis. (*Id.* ¶ 33 n.2 (quoting Robinson Aff. at Ex. D)). Unfortunately, the Ontario County Clerk entered the judgment nevertheless. In this way, this portion of the "facts" that Cap Call includes in its moving brief are errant. (*Id.* ¶ 33 n.2).

counterclaim on July 21, 2017. (*Id.*, Ex. H).

On or about July 26, 2017, Cap Call filed its motion for summary judgment.

The parties have not yet had their initial conference with the Court, which is scheduled for September 6, 2017. As zero discovery has taken place at this juncture – before even a case management and scheduling order has been entered – discovery is needed to ascertain facts material to the dispute between the parties.

For example, aside from the typical discovery that Plaintiffs are entitled, Plaintiffs will seek in their notice to produce and interrogatories:

    a.  All communication between Richmond Capital and Cap Call concerning Z-Axis to determine what part Cap Call played in the deceptive practices and misrepresentations to Plaintiffs when being sold the deal in dispute.

    b.  All communication between Richmond Capital and Cap Call generally to determine what type of relationship these entities share, especially considering Cap Call's representations that one of its "priorit[ies]" is to ensure brokers (such as Richmond Capital) "make the maximum amount of commission," and that it works for the broker (Richmond Capital), and that the broker "represent[s] [Cap Call] directly."

    c.  Any and all requests of any kind by Cap Call to Z-Axis seeking Z-Axis's receivables, invoices, or identity of customers, which is relevant to a further showing – in addition to what is plain on the face of the Cap Call agreement – that the Cap Call agreement is a loan, not a "merchant agreement."

    d.  All records reviewed by Cap Call to come to the Specified Daily Amount of $1,999 to be paid by Z-Axis to Cap Call per day, which is relevant to a further showing – in addition to what is plain on the face of the Cap Call agreement – that the Cap Call agreement is a loan, not a "merchant agreement."

    e.  A detailed description of the calculation used, based on Z-Axis's actual receivables, to reach the Specified Daily Amount of $1,999, which is relevant to a further showing – in addition to what is plain on the face of the Cap Call agreement – that the Cap Call agreement is a loan, not a "merchant agreement."

(*Id.* ¶ 43).

Plaintiffs are entitled to this and other discovery from Cap Call. It was premature for Cap Call to file its summary judgment motion before such discovery was exchanged. For multiple reasons, Cap Call's summary judgment motion must be denied.[3]

## LEGAL ARGUMENT

### I. Cap Call's motion for summary judgment is premature.

Cap Call's motion for summary judgment is premature. To be sure, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to 'secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (citation omitted). Summary judgment, however, is proper only after the non-moving party has been given "adequate time for discovery." *1443 Chapin St., LP v. PNC Bank, Nat'l Ass'n*, 258 F.R.D. 186, 187 (D.D.C. 2009) (internal quotation marks omitted); *see also Celotex Corp.*, 477 U.S. at 322 (summary judgment can be entered only "after adequate time for discovery"); *Anderson*, 477 U.S. at 257 (summary judgment is proper only "as long as the plaintiff has had a full opportunity to conduct discovery"). Thus, under Rule 56(d), "[i]f a party opposing the motion shows by affidavit that, for specified reasons, it cannot present facts essential to justify its opposition, the court may . . . deny the motion . . . [or] order a continuance to enable affidavits to be obtained, depositions to be taken, or other discovery to be undertaken." Fed. R. Civ. P. 56(f). "The court must give a party opposing summary judgment an adequate opportunity to obtain discovery." *Patton v. Gen. Signal Corp.*, 984 F. Supp. 666, 670 (W.D.N.Y. 1997) (citation and internal quotation marks omitted); *Park Ave. Bank, N.A. v. Bankasi*, No. 93 CIV. 1483, 1995

---

[3] Cap Call's summary judgment motion does not annex a "short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried," as required by Local Civil Rule 56.1. L. Civ. R. 56.1. Cap Call's failure in that regard is a "grounds for denial of the motion" on its own. *Id.* As a practical matter, Cap Call's failure makes it impossible for Plaintiffs to respond in "correspondingly numbered paragraphs" to a statement of material facts that does not exist. *Id.* The facts that Plaintiffs do highlight, however, either are disputed, support Plaintiffs' position, or require further discovery to analyze properly.

U.S. Dist. LEXIS 18433, at *3 (S.D.N.Y. Dec. 13, 1995) ("Summary judgment is strongly disfavored prior to the parties having had an adequate opportunity for discovery."), *aff'd*, 101 F.3d 1393 (2d Cir. 1996).

Rule 56(d) affirms the importance of discovery in defending a summary judgment motion, and "is intended to prevent railroading a non-moving party through a premature motion for summary judgment before the non-moving party has had the opportunity to make full discovery." *Milligan v. Clinton*, 266 F.R.D. 17, 18 (D.D.C. 2010) (citations and internal quotation marks omitted). To justify the need for *belated* discovery, an explanation of how the needed discovery would be obtained, how the facts would raise a genuine issue of material facts, what efforts have been made to obtain the discovery, and why such efforts were unsuccessful can be included in an affidavit in opposition to a summary judgment motion. *Sacks v. Gandhi Eng'g, Inc.*, 999 F. Supp. 2d 629, 645 (S.D.N.Y. 2013). As long as the non-moving party has not been dilatory, courts grant Rule 56(d) requests "almost as a matter of course." *Wichita Falls Office Assocs. v. Banc One Corp.*, 978 F.2d 915, 919 n.4 (5th Cir. 1992). Granting a Rule 56(d) request is especially important where, as here, the moving party asserts material facts without providing the opposing party a fair opportunity to conduct discovery.

Here, Plaintiffs filed their complaint against Defendants on May 25, 2017. Defendant Richmond Capital Group, LLC filed a motion to dismiss under Rule 12(b) on or about June 21. Cap Call filed an answer and counterclaim on or about June 30. Plaintiffs opposed the motion to dismiss and cross-moved to amend on July 19, and answered Cap Call's counterclaim on July 21. On July 26, just five days after Plaintiffs answered Cap Call's counterclaim, Cap Call filed the instant motion for summary judgment. Cap Call filed its summary judgment motion despite that (i) no party had propounded even its first set of written discovery requests; (ii) no

depositions have been scheduled, let alone taken; and (iii) the Court has not even entered a scheduling order providing applicable dates and deadlines for discovery, dispositive motions, and other routine case management issues.

In the present case, some of the discovery that is required follows: all communication between Richmond Capital and Cap Call concerning Z-Axis to determine what part Cap Call played in the deceptive practices and misrepresentations to Plaintiffs when being sold the deal in dispute; all communication between Richmond Capital and Cap Call generally to determine what type of relationship these entities share, especially considering Cap Call's representations that one of its "priorit[ies]" is to ensure brokers (such as Richmond Capital) "make the maximum amount of commission," and that it works for the broker (Richmond Capital), and that the broker "represent[s] [Cap Call] directly"; any and all requests of any kind by Cap Call to Z-Axis seeking Z-Axis's receivables, invoices, or identity of customers, which is relevant to a further showing – in addition to what is plain on the face of the Cap Call agreement – that the Cap Call agreement is a loan, not a "merchant agreement"; all records reviewed by Cap Call to come to the Specified Daily Amount of $1,999 to be paid by Z-Axis to Cap Call per day, which is relevant to a further showing – in addition to what is plain on the face of the Cap Call agreement – that the Cap Call agreement is a loan, not a "merchant agreement"; a detailed description of the calculation used, based on Z-Axis's actual receivables, to reach the Specified Daily Amount of $1,999, which is relevant to a further showing – in addition to what is plain on the face of the Cap Call agreement – that the Cap Call agreement is a loan, not a "merchant agreement." This is not an exhaustive list of the discovery needed.

Accordingly, Plaintiffs respectfully request that this Court deny Cap Call's motion for summary judgment as premature. Alternatively, this Court should stay its consideration of the

motion, enter a case management order, and permit Plaintiffs to take discovery and ascertain facts essential to adequately oppose Cap Call's summary judgment motion.

## II.     Cap Call's summary judgment motion must be denied because there exists genuine issues of material fact.

If the Court is not inclined to deny or stay consideration of Cap Call's summary judgment motion as premature, the Court must nevertheless deny Cap Call's motion on the merits because numerous genuine issues of material fact remain. Rule 56 provides, in pertinent part: "The judgment sought shall be rendered forthwith if the pleadings, the discovery and disclosure materials on file, and any affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

Thus, under Rule 56(c), summary judgment is only to be entered if the moving party demonstrates that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. The moving party "bears the burden of establishing that no genuine issue of material fact remains for trial." *Consarc Corp. v. Marine Midland Bank, N.A.*, 996 F.2d 568, 572 (2d Cir. 1993). Summary judgment should be entered if the evidence is such that a reasonable jury could only find for the moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  "That is to say, when examining the record before it to see if there are any genuine issues of material fact, the court's focus is on issue-finding, not on issue-resolution." *Consarc Corp.*, 996 F.2d at 568. "In making its assessment, the trial court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Id.* Here, there exists genuinely disputed material facts that undercut Cap Call's motion. Cap Call has not come close to meeting its burden to show otherwise.

### Misrepresentation and Deceptive Business Practices.

Under New York law, fraudulent misrepresentation is found when the defendant makes a

material false representation; with the intent that the plaintiff rely upon it; reasonable reliance by the plaintiff; and resulting damages. *Wall v. CSX Transp., Inc.*, 471 F.3d 410, 415-16 (2d Cir. 2006). Negligent misrepresentation, on the other hand, involves carelessness in imparting words; upon which others are expected to rely; justifiable reliance to their detriment; by way of words conveyed directly to the relying party, with whom the author has a relationship or some duty of care. *Allen v. Westpoint-Pepperell, Inc.*, 11 F. Supp. 2d 277, 284 (S.D.N.Y 1997). And an agent binds the principal with the agent's misrepresentations if authorized to represent the principal in obtaining the contract. *Pereira v. Aetna Cas. & Sur Co.*, 186 F.3d 196, 207 (2d Cir. 1999).

Section 349 of the GBL states: "Deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful." N.Y. Gen. Bus. Law § 349. "A § 349 claim has three elements: (1) the defendant's challenged acts or practices must have been directed at consumers, (2) the acts or practices must have been misleading in a material way, and (3) the plaintiff must have sustained injury as a result." *Cohen v. JP Morgan Chase & Co.*, 498 F.3d 111, 126 (2d Cir. 2007).

"The 'consumer oriented' requirement does not preclude businesses from acting as plaintiffs in lawsuits pursuant to Section 349." *Statler v. Dell, Inc.*, 775 F. Supp. 2d 474, 484 (E.D.N.Y. 2011). In *Statler*, the court rejected the defendant's dismissal motion that it brought on the theory that the plaintiff was a small business and not a consumer: "As to the first ground, the court rejects the argument that Plaintiff's status as a small business owner, standing alone, precludes him from satisfying the 'consumer oriented,' prong of a Section 349 cause of action." *Id.*; *see also N. State Autobahn, Inc. v. Progressive Ins. Grp. Co.*, 953 N.Y.S.2d 96, 100-01 (App. Div. 2012) ("Section 349 governs consumer-oriented conduct and, on its face, applies to virtually all economic activity[.] . . . [Consumer-oriented] where it constituted a standard or routine

16

practice that was consumer-oriented in the sense that [it] *potentially* affect[ed] similarly situated consumers[.]" (second and third alterations in original) (emphasis added) (citation and internal quotation marks omitted)); *Bristol Vill., Inc. v. La.-Pac. Corp.*, 916 F. Supp. 2d 357, 367-68 (W.D.N.Y. 2012) ("Contrary to Defendant's argument, Plaintiff is not precluded from pursing a § 349 claim by the fact that it is a corporate entity."). "The New York Court of Appeals has adopted an objective definition of 'misleading,' under which the alleged act must be "likely to mislead a reasonable consumer acting reasonably under the circumstances." *Id.* (citation omitted). Disclosure of an unwarranted fee does not escape § 349's "deceptive practices" prohibition. *Cohen*, 498 F.3d at 127.

The transactions here are consumer oriented and misleading. Cap Call advertises that it regularly works as a broker's partner to fund deals such as the one subject to this lawsuit. Despite Cap Call's conclusory assertion that "Cap Call plays no part in the discussion" of Richmond Capital's unreasonable broker's fee (here, a $40,000 broker's fee on what was supposed to be $400,000 funded), Cap Call advertises that one of its "priorit[ies]" is to ensure broker's (such as Richmond Capital) "make the maximum amount of commission." Indeed, Cap Call confirms that it works for the broker, and that the broker "represent[s] [Cap Call] directly." Even without any discovery, this creates an issue of fact as to whether Cap Call truly "has no part in the dispute between the broker and the merchant." (Cap Call Br. at 10).

Such a relationship unquestionably mutually benefits both Cap Call and Richmond Capital: Richmond Capital poaches unsuspecting small businesses for "funding," using various funders (even though it could fund the deal itself) so that it can charge multiple broker's fees, and Cap Call enjoys the astronomical interest rate of 80% per annum on the actual funding without, as below, the risk of not recovering its funding. And even without this admission,

17

agency principles dictate that Cap Call bears responsibility for the misrepresentations to Plaintiffs. *See, e.g.*, *Pereira*, 186 F.3d at 207 ("[A]n agent's misrepresentations bind the principal if the agent was authorized to represent the principal in obtaining the contract.").

Finally, Plaintiffs seek rescission of the funding deal (which was repeatedly represented to Plaintiffs as "one deal" from one funder (Richmond Capital)) in its entirety, thus putting all parties back to the position before this conning began. In that instance, even if only the Court found (although it is too early to tell at this point) that only Richmond Capital blitzed Plaintiffs with misrepresentations, Cap Call is obviously a necessary defendant as its contract would be equitably rescinded. *Richmond Lace Works, Inc. v. Epstein*, 31 F.R.D. 150, 153 (S.D.N.Y. 1962) ("The law of New York on this point is well established that where rescission of a contract would materially affect the rights of some persons under an agreement, such persons are indispensable parties.").[4]

**Declaratory Judgment**.

The Court retains broad discretion to exercise jurisdiction over declaratory judgment actions. *Myers Indus. v. Schoeller Arca Sys.*, Inc., 171 F. Supp. 3d 107, 122 (S.D.N.Y. 2016). Declaratory judgment is appropriate when "an actual controversy exists." *Id.* "An actual controversy is one where 'the facts alleged, under all circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'" *Id.* (quoting *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007)). Here, an actual controversy exists as to whether the Cap Call agreement is a loan, as Plaintiffs contend. This is yet another fact that Cap Call

---

[4] Although this Court should deem Cap Call's agreement void (analyzed below), Cap Call's application actually supports a finding that Cap Call breached the agreement. Indeed, despite Cap Call's gratuitous references its payment from Z-Axis being "conditional" on Z-Axis's receipt of receivables, Cap Call offers no evidence that it ever attempted to verify whether Z-Axis was still collecting receivables before Cap Call filed its confession of judgment. In that regard, Cap Call would have breached that illusory provision of the Cap Call agreement.

ostensibly deems "undisputed." *See* Cap Call Br. at 10 ("Cap Call's MCA with Plaintiff is for the purchase of future receivables and is not a loan."). Should this Court declare the Cap Call agreement a loan, the interest rate would be criminally usurious and therefore void.

The Cap Call agreement is a loan. A definitive case on this subject – the only published New York case research has revealed – is *Merchand Funding Services, LLC v. Volunteer Pharmacy Inc.*, 44 N.Y.S.3d 876, 877 (N.Y. Sup. Ct. 2016). Here, Cap Call filed a confession of judgment based upon an "merchant agreement" similar to the agreement found to be a criminally usurious loan in *Merchant Funding*:

> MFS asserts, in the aforementioned affidavit of nonpayment, that it agreed to buy all rights to VP's future accounts receivable, having a face value of $74,750.00, for a purchase price of $50,000.00, and that the repayment of the $74,750.00 was to be accomplished by debiting VP's bank account by the Specified Percentage of 15% until that amount was paid in full. The documents belie this claim . . . .

> The Addendum to Secured Merchant Agreement (Addendum) states, in pertinent part:

>> 1. Should any of the terms of this Addendum conflict with the terms of the agreement . . . then the terms of this Addendum shall govern and be controlling . . .

>> a. By signing below, the Merchant hereby requests and acknowledges that the Specified Percentage shall be revised to $999.00 per business day . . . .
>> . . . .

> Therefore, doing basic mathematical calculations, the controlling payment schedule set forth in the Agreement with Addendum contemplates a criminally usurious interest rate of approximately 167%, as claimed by VP.

*Merch. Funding*, 44 N.Y.S.3d at 880.

Cap Call's agreement is no different: it claims Z-Axis had to pay a percentage of receivables when, in fact, Z-Axis was obligated to make a fixed daily payment of $1,999 and was charged annual interest of over 80%. *Merchant Funding* reasoned that, upon a "review of the documents and consideration of the parties' respective arguments, the Court comes to the inevitable conclusion that the real purpose of the Agreement was for [VP] to lend money to [MFS] at the usurious interest rate set forth therein, and that [MFS] agreed to borrow the money based on the same usurious terms dictated by [VP]." *Id.* at 881. The court continued: "MFS offers no evidence that it purchased certain of VP's receivables, that such receivables were dedicated to the repayment of the monies loaned, and that the risk inherent in the payment by way of these receivables was borne by MFS." *Id.* "MFS no more purchased [VP's] receivables than a bank which gives people loans after getting proof of their employment is purchasing their future paychecks." *Id.*

So too here. The amount over principal that Z-Axis had to pay Cap Call was $79,800 in 140 business days, which comes to 81% interest per year. Cap Call offers no evidence that it purchased certain of Z-Axis's receivables, that those receivables were dedicated to the repayment of the monies loaned, or that the it bore the risk in payment via Z-Axis's receivables. The loan was criminally usurious. "Criminal usury requires proof that the lender (1) knowingly charged, took or received (2) annual interest exceeding 25% (3) on a loan or forbearance." *In re Venture Mortg. Fund, L.P.*, 245 B.R. 460, 473-74 (Bankr. S.D.N.Y. 2000) ("If usury is proved, the loan is deemed void, and the lender sacrifices his principal and interest.").

### *Cap Call did not purchase receivables.*

Although Cap Call presented its agreement with Z-Axis as a purchase of receivables, it was simply a loan under a different name. As in *Merchant Funding*, (1) Cap Call neither

20

requested nor received the identity of any Z-Axis receivable, customer, or invoice; (2) the Cap Call agreement had no mechanism or intent for the delivery to Cap Call of any Z-Axis receivable or invoice, or the identity of any Z-Axis customer; (3) the Cap Call agreement intended for Z-Axis customers to pay Z-Axis as they did before the Cap Call agreement; (4) if a customer did not pay Z-Axis, it was solely Z-Axis's loss, not Cap Call's; (5) Cap Call took zero risk that a customer of Z-Axis might not pay; (6) the only obligation of Z-Axis under the agreement was to pay daily the Specific Daily Amount of $1,999; and (7) Plaintiff Srinivas Nomula had to personally guaranty Z-Axis's payment to Cap Call.

The rights and obligations expressed in the agreement ensured Cap Call's receipt of $79,800 in interest on its $200,000 payment in the span of just 180 days. As in *Merchant Funding*, Z-Axis had to pay a specific daily amount and its owner had to guaranty that payment. In ruling the so-called "merchant agreement" really just a disguised loan, *Merchant Funding* was not breaking new ground. This Circuit has contrasted a receivables purchase from a loan before:

> Where the lender has purchased the accounts receivable, the borrower's debt is extinguished and the lender's risk with regard to the performance of the accounts is direct, that is, the lender and not the borrower bears the risk of non-performance by the account debtor. If the lender holds only a security interest, however, the lender's risk is derivative or secondary, that is, the borrower remains liable for the debt and bears the risk of non-payment by the account debtor, while the lender only bears the risk that the account debtor's non-payment will leave the borrower unable to satisfy the loan.

*Endico Potatoes v. CIT Group/Factoring*, 67 F.3d 1063, 1069 (2d Cir. 1995). Z-Axis's debt was far from "extinguished" upon entering into the Cap Call agreement. Indeed, the agreement was carefully crafted so that Z-Axis would remain on the hook under any circumstance.

The agreement does not include a non-recourse provision by which Cap Call assumed the risk that it might not be able to collect payments from Z-Axis's accounts receivable. "Merely

telling the Court that risk is contemplated under the terms of the Agreement is inadequate . . . ." *Merch. Funding*, 44 N.Y.S.3d at 880. Courts in this District understand "that it is often inadequate merely to apply in a mechanical fashion the bare language of an agreement." *In re O.P.M. Leasing Servs., Inc.*, 30 B.R. 642, 648 (Bankr. S.D.N.Y. 1983) ("Although the agreement contained terms like "purchase", "sale", and "discount", the Third Circuit found that Major's credit obligation to Castle was nevertheless merely a transfer to secure indebtedness. In so ruling, the court reasoned that none of the risks of uncollectability generally present in a true sale of accounts was transferred to the credit company because of the credit company's recourse to Major's. Thus, the true nature of the transaction was that of a secured loan.").

With Cap Call's agreement, there was no forgiveness of the loan if Z-Axis was unable to collect a receivable. For example, if Z-Axis declared bankruptcy or its business declined, the agreement enables Cap Call to enforce the provisions of the personal guaranty against Plaintiff Srinivas Nomula or declare an "Event of Default" under which the "Specified Percentage" of repayment shall go from 10% to 100%. As our United States Supreme Court has said:

> [A]ppellant, by virtue of the contracts between it and the bankrupts . . . did not become the purchaser or owner of the accounts receivable in question, and . . . the transactions were really loans, with the accounts receivable transferred as collateral security. . . . To quote from the opinion of the District Court: "The considerations which support this conclusion are that the bankrupts were to and did collect the accounts and bear all expense in connection with their collection; . . . In so far as the contracts in question here use words fit for a contract of purchase they are mere shams and devices to cover loans of money at usurious rates of interest."

*Home Bond Co. v. McChesney*, 239 U.S. 568, 575-76 (1916). Cap Call's "merchant agreement" is a sham: it is dressed up with flowery language but operates as a loan. *C.f. Trimper v. Terminix Int'l Co.*, 82 F. Supp. 2d 1, 4 (N.D.N.Y. 2000) ("A rose by any other name is still a rose.").

The fixed daily payment required by Cap Call was not at all contingent on its own collection of any receivable. Z-Axis remained at risk of non-paying customers. Nothing in the agreement transferred that risk to Cap Call, despite the "purchase of receivables" language. *See Abir v. Malky, Inc.*, 873 N.Y.S.2d 350, 353 (App. Div. 2009) ("When determining whether a transaction constitutes a usurious loan it must be considered in its totality and judged by its real character, rather than by the name, color, or form which the parties have seen fit to give it." (citation and internal quotation marks omitted)).

Charging an interest rate well over 25% (indeed, upwards of 80%), Cap Call could not label its agreement a loan. But as New York law makes clear, Cap Call must do more than quote provisions of the agreement that state it was a purchase of receivables. Considered in totality and judged by its real character, rather than by name or form, Cap Call's agreement is a loan. To be sure, a purchase or receivables has objective qualities nowhere to be found in the agreement:

> A factor purchases accounts receivable at a discount from the invoice amount. In return for the right to collect on the invoice and retain the difference between the invoice amount and the discounted purchase price, the factor assumes the credit risk on the accounts, defined as the financial inability of the account debtor to pay.

*Dessert Beauty, Inc. v. Platinum Funding Corp.*, 519 F. Supp. 2d 410, 413 (S.D.N.Y. 2007) (internal footnotes omitted). "'Factoring' is 'the buying of accounts receivable at a discount. The price is discounted because the factor (who buys them) assumes the risk of delay in collection and loss on the accounts receivable.'" *Quantum Corp. Funding, Ltd. v. Assist You Home Health Care Servs. of Va., L.L.C.*, 144 F. Supp. 2d 241, 242 n.2 (S.D.N.Y. 2001) (quoting *Black's Law Dictionary* 612 (7th ed. 1999)).

Under Cap Call's agreement, nothing was contemplated to be identified or delivered to Cap Call except the money that Cap Call initially paid Z-Axis and the much larger sum that Z-

23

Axis had to pay back. Cap Call did not purchase receivables; Cap Call lent Z-Axis funds at an interest rate over what the criminal usury laws of this State allow.

### *The Cap Call agreement spared Cap Call from any real risk of non-payment.*

Z-Axis was bound by the incredible daily payment of $1,999 to Cap Call. Despite illusory claims to the contrary, the $1,999 daily payments had no real contingency. The Cap Call agreement was carefully crafted to ensure that, should the $1,999 daily payment be too much for Z-Axis to maintain, Cap Call could declare Z-Axis in default and responsible for the entire amount due. The daily payment was not to be paid by check which Z-Axis could withhold if it believed Cap Call had breached the agreement, but instead by ACH debit. As evident by Cap Call's collection efforts here, Z-Axis could not stop the ACH debits or it would be in default, and Cap Call would next file a confession of judgment that included over $40,000 of attorney's fees.

The agreement's reconciliation provision was facially unenforceable because it was negated by the second sentence, which provides that Z-Axis had no right whatsoever to an adjustment of the $1,999 daily payment unless Cap Call voluntarily made it: "CCL may, upon Merchant's request, adjust the amount of any payment due under this Agreement at CCL's sole discretion and as it deems appropriate." Not only was an adjustment of the Specific Daily Amount to what Cap Call deemed "appropriate," in its "sole discretion," an enforceable standard, but the voluntary nature of the adjustment is further evidenced by use of the permissive "Cap Call may." *New York State Electric & Gas Corp. v. Aasen*, 550 N.Y.S.2d 223, 225 (App. Div. 1990) ("A review of the option shows repeated use of the word 'shall' in a mandatory mode with other terms and conditions. The word 'may' provides for a permissive and not a mandatory meaning within the context of the option agreement. The paragraph cannot be challenged by parol evidence." (internal citations omitted)).

The agreement had a personal guaranty and security agreement which have been found to eliminate any risk or hazard. *Clever Ideas, Inc. v. 999 Rest. Corp.*, 2007 NY Slip Op 33496(U), 2007 N.Y. Misc. LEXIS 9248, at *5-*6 (N.Y. Cnty. Sup. Ct, Oct. 26, 2007):

> The transactions at issue here are clearly payable absolutely, and thus loans. Beyond the superficial hazard associated with a New York restaurant's relatively meager chance of success, CI backed up the risk with the Balan's personal guarantee and a security interest in Nello's property. Moreover, any default of the Agreements (including the restaurant's closing or bankruptcy) would trigger payment. Hence, there are no reasonable means of non-payment, and accordingly no risk of non-payment. Consequently, the usury defense is available to defendants and will not be dismissed.

"[A] corporation or PLLC, or a guarantor of such an entity's debt, may assert the defense of criminal usury." *Fred Schutzman Co. v. Park Slope Advanced Med., PLLC*, 9 N.Y.S.3d 682, 683 (App. Div. 2015). "Since ASI has successfully asserted criminal usury as an affirmative defense, the loan transaction and the associated note, loan agreement, and collateral agreement are void and unenforceable." *Blue Wolf Capital Fund II, L.P. v. Am. Stevedoring Inc.*, 961 N.Y.S.2d 86, 90 (App. Div. 2013) (citation omitted).

"It is not difficult to ascertain that the criminal usury statutes fall within the class of rules created for the protection of society as a whole. They were enacted in an effort to protect the public from loansharking. *Hammelburger v. Foursome Inn Corp.*, 437 N.Y.S.2d 356, 359 (App. Div. 1980). Under New York law, only the initial interest rate determines usury. Even if Cap Call decided to voluntarily perform a reconciliation, it would not save the agreement from its usurious rate.[5]

---

[5] Plaintiffs obviously oppose Cap Call's request for attorney's fees – a request that Cap Call attempts to bolster via self-serving references to a "discuss[ion] with counsel." (Cap Call Br. at 3). As this opposition shows, Plaintiffs pled legitimate claims against Cap Call, and Plaintiffs fully intend to pursue those.

## CONCLUSION

Plaintiffs respectfully request that the Court deny Cap Call, LLC's motion for summary judgment in its entirety.

**ARCHER & GREINER, P.C.**
44 Wall Street, Suite 1285
New York, New York 10005
201-342-6000
ppapalia@archerlaw.com
jcontarino@archerlaw.com
*Attorneys for Plaintiffs*


    *s/ Josiah Contarino*
By:   Patrick Papalia
      Josiah Contarino

Dated: August 22, 2017

26