IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Z-AXIS TECH SOLUTIONS, INC. and SRINIVAS NOMULA,<br><br>Plaintiffs,<br><br>v.<br><br>RICHMOND CAPITAL GROUP, LLC and CAP CALL, LLC,<br><br>Defendants. | Civil Action: 17-cv-03983 (GBD)<br><br>**AFFIDAVIT OF SRINIVAS NOMULA IN OPPOSITION TO CAP CALL LLC'S MOTION FOR SUMMARY JUDGMENT** |

I, SRINIVAS NOMULA, hereby declare under penalty of perjury that the following is true and correct to the best of my knowledge:

1. I am the owner of Z-Axis Tech Solutions, Inc. and was involved with the transactions in dispute in this matter. I am also a named Plaintiff. As such, I have personal knowledge of the facts stated in this affidavit.

2. I make this affidavit in opposition to Defendant Cap Call, LLC's ("Cap Call") motion for summary judgment that seeks to dismiss Plaintiffs Z-Axis and Srinivas Nomula's ("Plaintiffs") complaint against Cap Call.

**The Funding.**

3. At 2:18 p.m. on March 27, 2017, Richmond Capital representative Mimi Parker emailed Z-Axis to introduce herself. In that email, Ms. Parker advised Z-Axis that Richmond Capital "ha[d] [Z-Axis] approved for 300k." A true and accurate copy of the email is attached as **Exhibit A**.

4. At 2:34 p.m. on March 27, Ms. Parker again emailed Z-Axis with these funding terms:

> We have 300k payback 420k daily $3,500 a day.
>
> With an early discount option that will be part of the addendum – which simply means if you choose to pay the money early we will give you a 10% discount.

A true and accurate copy of the email is attached as **Exhibit B**.

5. At 3:22 p.m. on March 27, Ms. Parker emailed a "1st AGREEMENT," which included three PDF documents: the first of which had a purported Merchant Agreement, a Security Agreement, a Guaranty, an Authorization for Servicing Agent, and ACH Authorization for Daily Withdrawals, all related to Cap Call; the second of which was a Confession of Judgment; the third of which was a single Richmond Capital ACH Authorization Form. A true and accurate copy of the email without attachments is attached as **Exhibit C**.

6. At 4:07 p.m. on March 27, Ms. Parker emailed a "2nd AGREEMENT," which included one PDF document that included the following: a purported Secured Merchant Agreement, a Security Agreement, a Guaranty, an Addendum to the Agreement regarding ACH payments, a Capital Advance ACH Authorization Form, and a Confession of Judgment. A true and accurate copy of the email without attachments is attached as **Exhibit D**.

7. The entire transaction took only approximately 4 hours from start to finish, as Richmond Capital was pressuring Z-Axis to quickly complete the deal. Although Z-Axis was to receive $400,000, $60,000 was wrongly and deceptively misappropriated by Defendants. When Z-Axis realized it had been deprived of $60,000, Z-Axis made immediate and regular contact with Richmond Capital for the return of the $60,000 to Z-Axis.

8. Richmond Capital initially represented not only that it would be providing the funding itself, but also that there would be only a single transaction. Indeed, Plaintiffs believed Richmond Capital to have been the funder as Richmond Capital reached out to Plaintiffs

regarding funding, was corresponding to and speaking with Plaintiffs during the transactions, and was sending documents and information to Plaintiffs for the transaction. *See* Exs. A-D.

9. Nevertheless, Cap Call and Capital Advance were lurking in the background. It obviously benefitted Richmond Capital to *not fund* the transaction, despite its representations that it would be, and to instead have the transaction funded by multiple separate funders, such as Cap Call and Capital Advance. *Not funding* the transaction allowed Richmond Capital to slip in with the loan agreements $40,000 of theretofore undisclosed "broker's fees." Obtaining two separate lenders to lend the monies, instead of one, allowed Richmond Capital to include *multiple* broker's fees, however unjustly.

10. And this benefit to Richmond Capital is precisely what Cap Call seeks to ensure. Cap Call advertises that one of its "priorit[ies]" is to ensure brokers (such as Richmond Capital) "make the maximum amount of commission." Indeed, Cap Call confirms that it works for the broker, and that the broker "represent[s] [Cap Call] directly." A true and accurate copy of the Cap Call webpage is attached as **Exhibit E**.

**The Cap Call Agreement.**

11. After Plaintiffs' complaint was filed with this Court, Cap Call went and filed a confession of judgment in the Ontario County Supreme Court of New York (Affidavit of Douglas E. Robinson, Esq. (July2 6, 2017) ("Robinson Aff."), Ex. D) upon an agreement that was couched as a merchant agreement (sometimes referred to as "Cap Call agreement" or "agreement") but is really a loan (Robinson Aff., Ex A). As is demonstrated and quoted below, the Cap Call agreement was really just a loan in disguise; the loan was criminally usurious at an annual interest rate upwards of 80%; and the agreement eliminated all risk and hazard of nonpayment to Cap Call.

3

12.     Contrary to Cap Call's representation that the agreement was a "no recourse" agreement from which Cap Call would collect receivables from Z-Axis only if receivables were received by Z-Axis, (Affidavit of Evan Marmott (July 26, 2017) ("Marmott Aff."), ¶ 13), the actual terms of the the Cap Call Agreement and the transaction at hand show that (1) Cap Call neither requested nor received the identity of any Z-Axis receivable, customer, or invoice; (2) the Cap Call agreement had no mechanism or intent for the delivery to Cap Call of any Z-Axis receivable or invoice, or the identity of any Z-Axis customer; (3) the Cap Call agreement intended for Z-Axis customers to pay Z-Axis as they did before the Cap Call agreement; (4) if a customer did not pay Z-Axis, it was solely Z-Axis's loss, not Cap Call's; (5) Cap Call took zero risk that a customer of Z-Axis might not pay; (6) the only obligation of Z-Axis under the agreement was to pay daily the Specific Daily Amount of $1,999; and (7) I had to personally guarantee Z-Axis's payment to Cap Call.

13.     Review of the agreement here shows that it feigned to be the purchase of receivables but was really just a loan. Indeed, whereas the house and closing date are identified in a purchase contract to buy a home, or the car and purchase date in a contract to buy a car, here, neither the Cap Call agreement nor any other document ever provided for the delivery or even the identify of any Z-Axis receivable, invoice or customer. It was therefore impossible for Cap Call to actually acquire or purchase any receivable of Z-Axis.

14.     Under the Cap Call agreement, the only thing contemplated to be identified or delivered was the Cap Call initial payment of $200,000 to Z-Axis, and Z-Axis's payment to Cap Call of $279,800.

15.     The interest charged by Cap Call on the Cap Call agreement was well over 25% per annum at an incredible 80%. Under the agreement, the total paid to Z-Axis was $200,000

(less Cap Call's fee), for which Z-Axis had to pay Cap Call back $279,800, by a daily payment of $1,999 per day. Under that payment schedule, the $279,800 would be paid off in 180 days (140 business days, as the agreement called for payment on business days only): $1,999 multiplied by 140 equals $279,860, thus Z-Axis had to pay $279,860 to Cap Call within 180 days.

16. The $79,800 was the interest that Z-Axis had to pay on the $200,000 it received from Cap Call. $79,800 interest on $200,000, if it had to be paid back over a year, would have been 39.9% interest. The agreement required payments of $1,999 per day, which meant approximately 140 payments of $1,999 each – or 180 days (140 business days) to pay the $279,800. 180 days is 49% of a year. Since 39.9% interest had to be paid back in 49% of a year, that was an annual interest rate of just over 80%: $79,800 divided by $200,000 equals 39.9%, which divided by .49 of a year, equals 81% interest.

17. With an annual interest rate above 25%, Cap Call could not designate its agreement a loan, so it had to label it something else. The only thing that Cap Call has to show that the agreement was a purchase of receivables was the mere say-so in its agreement. The only thing Cap Call wanted to get under the terms of the agreement was payment of $279,800 at $1,999 per day. Where A pays B a sum of money and B has to pay A back more, that is a loan. Nevertheless, the Cap Call agreement categorized Cap Call as the "purchaser" even though the agreement was designed for Cap Call to be the one getting paid.

18. The $1,999 per day that Z-Axis had to pay Cap Call was seemingly arbitrary, purportedly "an estimate" of 10% of Z-Axis's daily receivables. (Marmon Aff., ¶ 14). Yet, in the other transaction that occurred near-simultaneously with Cap Call's, and also brokered by Richmond Capital, $1,999 was calculated as 15% of Z-Axis's daily receivables. The 10% made

little difference anyway as it was replaced by the Specific Daily Amount of $1,999, an "estimate" that was meaningless because Cap Call never asked for any information about Z-Axis's expenses, such as the salaries of its employees or otherwise. Apparently, the real intent behind the Specific Daily Amount of 10% was to fool me into believing that this was the actual interest rate.

19. The agreement between the parties eliminated all risk or hazard that Cap Call would not be paid. The agreement's first page stated that $200,000 would be paid to Z-Axis from Cap Call ("Purchase Price"), and that $279,800 ("Receipts Purchased Amount") would be paid to Cap Call by Z-Axis at $1,999 per business day. The first page provided that Cap Call would ACH-debit the Specific Daily Amount each business day:

> The Purchased Amount shall be paid to CCL by Merchant's irrevocably authorizing only one depositing account . . . to remit . . . until such time as CCL receives payment in full of the Purchased Amount. Merchant hereby authorizes CCL to ACH Debit the specified remittances from the Merchant's bank account on a daily basis . . . . Merchant understands that it is responsible for ensuring that the Specified percentage to be debited by CCL remains in the account . . . .

Agreement at 1.

20. The Merchant's "ensuring" that the daily debit is in the account demonstrates that the Specific Daily Amount was not dependent on any sales or revenue. Z-Axis did not have a choice to pay the Specific Daily Amount by check or other means. It was automatically debited by ACH debit, each business day, by Cap Call.

21. Despite Cap Call's representations to support its motion that Z-Axis's repayment of the $200,000 was "conditional," the Cap Call agreement includes a fail-safe provision under which Z-Axis would be in default if its financial condition developed any material adverse

change:

> Merchant represents, warrants and covenants that as of this date and during the term of this Agreement: **2.1 Financial Condition and Financial Information.** Its bank and financial statements . . . and future statements which will be furnished hereafter at the discretion of CCL, fairly represent the financial condition of Merchant at such dates, and since those dates there has been no material adverse changes, financial or otherwise, in such condition, operation or ownership of Merchant. Merchant has a continuing, affirmative obligation to advise CCL of any material adverse change in its financial condition, operation or ownership.

Agreement § 2.

22. Section 3.1 states that if the "Merchant shall violate any term or covenant in this Agreement" it was an "Event of Default." The Agreement also provides that, in an "Event of Default," the "Specified Percentage" shall go from 10% to 100%. The warranty and covenant in Section 2.1 eliminated all risk or hazard of nonpayment because it contained a MAC (material adverse change) clause that extended throughout "the term of this Agreement." The MAC clause put Z-Axis in default if it had any material adverse change in its financial condition until Cap Call was paid in full. Diminished cash flow threatening the daily payment was a material adverse change. The MAC clause was intended strictly to put the Merchant with diminishing cash flow into default, and no other purpose, as evidenced by section 1.3. The MAC clause was not to protect Cap Call from having to fund Z-Axis because section 1.3 provided that Cap Call "reserves the right to rescind the offer to make any purchase payments hereunder, in its sole discretion."

23. Section 1.5 of the Cap Call agreement stated that the "Merchant authorizes their bank to provide CCL with Merchant's banking and/or credit-card processing history to determine

7

qualification or continuation in this program."[1] Conditioning Z-Axis's "continuation in this program" on a Cap Call's investigation in Z-Axis's financial outlook enabled Cap Call to use section 2.1 to put Z-Axis in default, thus eliminating Cap Call's risk of non-payment under the agreement.

24. Page 1, penultimate paragraph, states that the "Merchant . . . authorizes CCL . . . to (i) investigate any references . . . or data obtained from or about Merchant . . . and (ii) pull credit report at any time . . . for CCL'S ability to determine Merchant's eligibility to enter into any future agreement with Company." Section 1.5's purpose was therefore not to determine Z-Axis's eligibility to enter into any future agreement with Cap Call (that is governed by the penultimate paragraph on page 1 of the agreement), but instead Z-Axis's eligibility to continue with the present loan.

25. The agreement also had a purported reconciliation provision for adjusting the Specific Daily Amount, first page, second paragraph:

> [U]pon Merchant's request, and receipt of the Merchant's monthly bank statements, CCL shall, on or about the fifteenth day of each month, reconcile the Merchant's account by either crediting or debiting the difference between the amount debited and the Specified Percentage, from or back to the Merchant's bank account so that the amount debited each month equals the Specified Percentage. CCL may, upon Merchant's request, adjust the amount of any payment due under this Agreement at CCL's sole discretion and as it deems appropriate. Notwithstanding anything to the contrary in this Agreement or any other agreement between CCL and Merchant, upon . . . the occurrence of an Event of Default under Section 3 of the MERCHANT AGREEMENT TERMS AND CONDITIONS, the Specified Percentage shall equal 100%.

26. This reconciliation provision was illusory because it was negated by the second sentence, which provides that Z-Axis had no right whatsoever to an adjustment of the $1,999

---

[1] The Cap Call agreement abbreviates Cap Call to "CCL."

daily payment unless Cap Call voluntarily made it: "CCL may, upon Merchant's request, adjust the amount of any payment due under this Agreement at CCL's sole discretion and as it deems appropriate."

27.     The volutary nature of the adjustmnet is further evidenced by use of the permissive "Cap Call may." Also, adjusting the Specific Daily Amount to what Cap Call deemed "appropriate," in its "sole discretion," was not an enforceable standard.

28.     Of course, as soon as Z-Axis requested any reduction in the fixed daily payment, it would violate the agreement's MAC clause, constituting an Event of Default.

29.     That the agreement removed all risk and hazard of nonpayment to Cap Call is further shown by its provisions concerning bankruptcy. Section 2.9 states that in "the event the Merchant files for bankruptcy . . . Protections 2 and 3 are immediately invoked." Section 1.11 explains the "protections": "**Protection 1.** The full uncollected Purchase Amount plus all fees due under this Agreement and the attached Security Agreement become due and payable in full immediately. **Protection 2.** CCL may enforce the provisions of the Personal Guarantee of Performance against the Guarantor."

30.     Thus, if receivables are not being paid to Z-Axis and it must file for bankruptcy, then Cap Call can collect on the Personal Guarantee against me. Bankruptcy is also an "Event of Default." Agreement § 3.1(c). The agreement therefore directly contradicts Cap Call's representation that it "has *no recourse* against a business or its principal if the business fails and the merchant ceases having receivables." (Marmott Aff. ¶ 13).

31.     Section 2.4 requires business-interruption insurance: "Merchant will maintain business-interruption insurance naming CCL as loss payee and additional insured in amounts and against risks as are satisfactory to CCL and shall provide CCL proof of such insurance upon

request."

32. Through multiple ways the agreement was carefully crafted to remove from Cap Call all risk and hazard of nonpayment. Review of the agreement in its entirety dismantles any claim to the contrary.

33. Indeed, Cap Call's actions corroborate such a reading. Cap Call offers no evidence that it attempted to determine the cause for any non-payment of receivables before filing its confession of judgment after "numerous NSF's [sic]" were returned. (Marmott Aff. ¶ 18). Further, the judgment included attorney fees of $44,962.50 even though everything Cap Call submitted was boilerplate (and yet it still incorrectly drafted the affidavit[2] in support thereof).

34. The agreement was a loan. The $79,800 on top of the $200,000 that Z-Axis had to repay within 140 business days was criminally usurious interest at 80%. The Cap Call agreeement is null and void.

**This Litigation.**

35. On May 25, 2017, Plaintiffs' complaint was filed with this Court. A true and accurate copy of the complaint is attached as **Exhibit F**.

36. On or about June 21, 2017, Defendant Richmond Capital Group, LLC filed a motion to dismiss under Rule 12(b).

37. On or about June 30, 2017, Cap Call filed an answer and counterclaim. On May 25, 2017, Plaintiffs' complaint was filed with this Court. A true and accurate copy of the complaint is attached as **Exhibit G**.

---

[2] The affidavit Cap Call filed with the Ontario County Clerk is wholly inaccurate, apparently reciting figures from an agreement entirely different from the one between Cap Call and Z-Axis. Robinson Aff. at Ex. D. Unfortunately, the Ontario County Clerk entered the judgment nevertheless. In this way, this portion of the "facts" that Cap Call includes in its moving brief are errant. Cap Call Br. at 6.

10

38. Plaintiffs opposed Richmond Capital's motion to dismiss on July 19, 2017. Plaintiffs also cross-moved for leave to file a first amended complaint.

39. Plaintiffs answered Cap Call's counterclaim on July 21, 2017. A true and accurate copy of the complaint is attached as **Exhibit H**.

40. On or about July 26, 2017, Cap Call filed its motion for summary judgment.

41. The parties have not yet had their initial conference with the Court, which is scheduled for September 6, 2017.

42. As zero discovery has taken place at this juncture – before even a case management and scheduling order has been entered – discovery is needed to ascertain facts material to the dispute between the parties.

43. For example, aside from the typical discovery that Plaintiffs are entitled, Plaintiffs will seek in their notice to produce and interrogatories:

   A. All communication between Richmond Capital and Cap Call concerning Z-Axis to determine what part Cap Call played in the deceptive practices and misrepresentations to Plaintiffs when being sold the deal in dispute.

   B. All communication between Richmond Capital and Cap Call generally to determine what type of relationship these entities share, especially considering Cap Call's representations that one of its "priorit[ies]" is to ensure brokers (such as Richmond Capital) "make the maximum amount of commission," and that it works for the broker (Richmond Capital), and that the broker "represent[s] [Cap Call] directly."

   C. Any and all requests of any kind by Cap Call to Z-Axis seeking Z-Axis's receivables, invoices, or identity of customers, which is relevant to a further

showing – in addition to what is plain on the face of the Cap Call agreement – that the Cap Call agreement is a loan, not a "merchant agreement."

D. All records reviewed by Cap Call to come to the Specified Daily Amount of $1,999 to be paid by Z-Axis to Cap Call per day, which is relevant to a further showing – in addition to what is plain on the face of the Cap Call agreement – that the Cap Call agreement is a loan, not a "merchant agreement."

E. A detailed description of the calculation used, based on Z-Axis's actual receivables, to reach the Specified Daily Amount of $1,999, which is relevant to a further showing – in addition to what is plain on the face of the Cap Call agreement – that the Cap Call agreement is a loan, not a "merchant agreement."

44. Plaintiffs are entitled to this and other discovery from Cap Call. It was premature for Cap Call to file its summary judgment motion before such discovery was exchanged.

I declare under penalty of perjury that the following is true and correct to the best of my knowledge.

_____
SRINIVAS NOMULA

Dated: August 22, 2017

213106032v1